IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | 2:11-cr-00261-GEB |
| Plaintiff, | |
| v. | ORDER RE DEFENDANT'S OBJECTIONS TO PRESENTENCE REPORT |
| JAYMAR DWAYNE JAMERSON, | |
| Defendant. | |

Defendant raises multiple objections to the Presentence Report ("PSR"). Each of Defendant's objections were discussed at the sentencing hearing held on June 28, 2013, and are addressed in turn below.

**A. Amount of Crack Cocaine**

Defendant objects to the United States Probation Officer's ("Probation's") finding that "[he is] responsible for 448 grams of crack cocaine." (Def.'s Supplemental Briefing in Supp. of Formal Objections to the [PSR] ("Def.'s Supp. Briefing") 2:12-13, ECF No. 90.) The basis for Probation's finding that "the total amount of cocaine base attributed to the defendant is approximately 448 grams" is as follows:

> According to the trial transcript, the Court determined that the defendant discarded a baseball-sized plastic baggie of a white rock substance, and he repeated the same exercise with three other bags containing similar size white rock like substance. Based on the Court's ruling, [Probation] believes

1

the defendant possessed 4 baseball-sized baggies.
                    According to Agent Nehring, one baseball-sized
                    baggie contained approximately 4 ounces (or 112
                    grams).

(PSR ¶ 16.) Defendant argues:

> there is insufficient evidence to find [Defendant] responsible for that amount . . . . Rather, the amount of crack cocaine that should be used to calculate the drug guideline should be no higher than the range between 196 to 280 grams for a base offense level 3[0]. . . . This addresses the Court's concern that more crack was thrown than was collected while acknowledging the impossibility of knowing exactly how much crack was thrown given the conflicting evidence at trial and the high burden of proof.

(Def.'s Supp. Briefing 2:13-22.)[1]

In support of his argument, Defendant's counsel brought a tennis ball and a baseball to the sentencing hearing. Despite their similarity in size, he indicated that the weight of four tennis ball-sized amounts of crack cocaine totals 275 grams, which falls within the weight range for a base offense level of thirty. (See Def.'s Ex. A in Supp. of Formal Objections to the PSR, ECF No. 99.) Defendant's counsel argued at the sentencing hearing that given the distance between Fairfield Police Officer Adam Brunie's vehicle and Defendant's vehicle during the February 1, 2011 police pursuit, and the speed at which they were traveling, the smaller tennis ball-sized amount of crack cocaine should be used.

---

[1] Defendant also argues in his Formal Objections that there is an issue regarding whether the "cocaine base" drugs that can be attributed to Defendant are "cocaine base" as defined by U.S. Sentencing Guidelines Manual ("Sentencing Guidelines") § 2D1.1. (Def.'s Objections to the [PSR] ("Def.'s Objs.") 2:12-16, ECF No. 82.) This argument is unpersuasive since the trial testimony of Solano County criminalist Nate Overlid establishes that the substance discarded by Defendant during the police pursuit is "cocaine base" as defined by section 2D1.1, i.e., "crack[,]" which "usually appear[s] in a lumpy, rocklike form." (Trial Tr. 403:6-408:21, June 6, 2012, ECF No. 85.)

2

The government counters that "objection to this 448 gram amount of crack cocaine seeks to relitigate the trial and attack again the credibility of Officer Brunie." (Gov't Resp. to Def.'s Objections to [PSR] ("Gov't Resp.") 5:11-13, ECF No. 95.) The government argues:

> Drug Enforcement Administration Special Agent Brian Nehring testified that, based on his experience in seizing and weighing various quantities of crack cocaine on hundreds occasions, [a] baseball size volume of crack cocaine would weigh approximately four ounces (or 112 grams). Multiplying the four baseball size crack cocaine bags that [Defendant] dumped during the police pursuit by 112 grams each yields 448 grams of crack cocaine.

(Id. at 4:26-5:6 (citation omitted).) The government further rejoined at the sentencing hearing, that even if Defendant discarded four tennis ball-sized amounts of crack cocaine, the base offense level is still 32, once the 92.6 grams of cocaine powder collected at 1101 Farmington Drive, #224, is considered. (See PSR ¶ 9.) Defendant's counsel agreed at the sentencing hearing that the government's "math" is correct in this regard, i.e., adding the 92.6 grams of cocaine powder, once converted to an amount of crack cocaine, results in a total of 280.18 grams of crack cocaine and a base offense level of thirty-two.[2]

Sufficient evidence exists in the sentencing record to support by clear and convincing evidence that Defendant possessed 448 grams of crack cocaine. Fairfield Police Officer Adam Brunie testified at trial that he as he followed Defendant's vehicle during the February 1, 2011 police pursuit at approximately a car length distance behind him, he witnessed Defendant "remove a . . . baseball-sized bag of a white substance" from the center console of his vehicle, "holding it like you

---

[2] Possession of "[a]t least 280 [grams] but less than 840 [grams] of Cocaine Base" results in a base offense level of thirty-two under Sentencing Guidelines § 2D1.1(c)(4). The base offense level is the same whether Defendant possessed 280 grams or 448 grams.

3

would a baseball, with his entire hand." (Trial Tr. 29:11-30:2, June 5, 2012, ECF No. 84.) Officer Brunie testified that Defendant "started banging [the object] against his driver's side door[,]" and shook out the contents of the bag. (Id. at 30:3-13.) Officer Brunie further testified:

> [He] observed the substance ricocheting off the ground. It was bouncing like a rock would. Parts of it were breaking off. Parts of it were hitting [his] car. You could hear it pinging against [his] hood, [his] bumper. Parts of it would hit [his] windshield, like leave little white marks -- white residue marks on [his] windshield. It was bouncing over into the units behind [him].

(Id. at 31:17-23.) Officer Brunie testified that Defendant repeated this process three additional times. (Id. at 35:13-23, 53:22-54:6.)

Notwithstanding Defendant's counsel's efforts to discredit Officer Brunie's trial testimony on the amount of crack Defendant discarded during the police pursuit, the undersigned judge finds his trial testimony credible.

Portions of the discarded substance were recovered and tested and were shown to be cocaine base, "also known as crack cocaine[,]" which is "rock-like." (Trial Tr. 168:1-181:2, 403:11-404:15, 407:6-408:1.) None of the recovered substances were cocaine powder, and one piece of recovered substance "was about the size of a golf ball." (Id. at 173:4-6, 178:3-11.)

Further, Drug Enforcement Administration ("DEA") Agent Brian Nehring provided expert testimony that in his experience, cocaine base "pushed together in the shape and size of a baseball . . . has usual[ly] been about four ounces [in] volume." (Trial Tr. 452:19-453:13, 459:12-23.)

Therefore, Defendant's objection to Probation's finding regarding the amount of crack cocaine attributable to Defendant is overruled.

### B. Paragraph Nine of the PSR

Defendant objects to the characterization of the 92.6 grams of substance referenced in paragraph nine of the PSR as cocaine base versus "powder cocaine." (Def.'s Objs. 2:18-19.)

The government "agrees . . . that the PSR should be changed to reflect that the 92.6 grams consisted of cocaine powder[,]" and states the correction "has no effect on [Defendant's] base offense level or sentencing guidelines range." (Gov't Resp. 7:1-4.)

Probation was ordered at the June 28, 2013 sentencing hearing to amend Paragraph nine of the PSR as agreed by the parties.

### C. Two Level Enhancement under Sentencing Guidelines § 2D1.1(b)(1)

Defendant objects to paragraph nineteen of the PSR, which recommends a two-level enhancement under Sentencing Guidelines § 2D1.1(b)(1) for possession of a firearm. (Def.'s Objs. 2:21-23.) Defendant argues:

> The PSR recommends the 2-level increase for the drug crimes for which [Defendant] has been convicted: possession of drugs in his car on February 1, 2011 (PSR para. 4, p. 3), and possession of drugs at 1101 Farmington Drive #244 on March 29, 2011 after [Defendant] had already been arrested (PSR para. 9, p. 4). [Defendant] did not possess a weapon in those places on either of those dates. Rather, the gun increase is proposed for a weapon possessed in an entirely different city – [Defendant's] home at 2250 Hilborn Road. PSR para. 8, p. 4. That is the only firearm at issue in this case.
>
> The PSR imposes the gun adjustment in paragraph 19 because the weapon was found at Hilborn Road where other "drug paraphernalia" was

> found. Despite the PSR's desire to link that weapon and drug trafficking, the weapon must relate to the offense, not to an uncharged and unproven offense at a different place and time. The PSR attempts to link the firearm to drug paraphernalia, but wholly fails to link the weapon to either drug offense charged in this case. A generalized view that the firearm may be linked to drug trafficking activity is insufficient to support the gun bump for the crimes of conviction where the weapon was not present at those offenses. Accordingly, the adjustment for the firearm must be stricken.

(Def.'s Supp. Briefing 7:19-25.)

The government counters that Defendant's "conten[tion] that he is not subject to this firearm enactment because his firearm was seized from his apartment . . . whereas the cocaine powder that he possessed with intent to distribute was stashed at the apartment of his girlfriend . . . is wrong." (Gov't Resp. 7:18-24.) The government argues:

> Regardless[] of the spatial separation between the firearm and the drugs stored at a separate stash location, [Defendant's] firearm was possessed to protect his drug operation wherever the tentacles of his criminal activity reached.
>
> Hence, as recommended by the PSR, the application of § 2D1.1's two-level enhancement is appropriate . . . , especially since [Defendant] cannot carry his burden and show that it is clearly improbable that the possession of the firearm is not connected with his offense of possession of the cocaine with intent to distribute.

(Id. at 11:19-27.)

Section 2D1.1(b)(1) prescribes: "If a dangerous weapon (including a firearm) was possessed, increase [the offense level] by [two] levels." Application Note three to this sentencing guideline section explains: "The enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if

6

the defendant, arrested at the defendant's residence, had an unloaded hunting rifle in the closet."

"In applying this enhancement, 'the court need not find a connection between the firearm and the offense. If it finds that the defendant possessed the weapon during the commission of the offense, the enhancement is appropriate.'" United States v. Lopez-Sandoval, 146 F.3d 712, 714 (9th Cir. 1998) (quoting United States v. Diego Restrepo, 884 F.2d 1294, 1296 (9th Cir. 1989)); accord United States v. Montengro, 221 F. App'x 527, 529 (9th Cir. 2007). "'[T]he key is whether the gun was possessed during the course of criminal conduct, not whether it was present at the site.'" Montengro, 221 F. App'x at 529 (quoting United States v. Stewart, 926 F.2d 899, 901 (9th Cir. 1991)).

On the same day that 92.6 grams of cocaine powder were found during a search of Defendant's girlfriend's apartment, "[a] search of Defendant's apartment revealed one stolen .45 caliber Glock pistol, eight boxes of sandwich bags, multiple rounds of .45 caliber and 9-millimeter ammunition, a scale with methamphetamine residue, multiple sets of keys, and 30.1 grams of marijuana." (PSR ¶¶ 8, 9.) Such evidence supports, by a preponderance of the evidence, that the firearm was in Defendant's possession at the time of the criminal conduct. See United States v. Michaud, 220 F. App'x 617, 618 (9th Cir. 2007) (upholding application of § 2D1.1(b)(1) enhancement where handgun "was found in a garage to which [Defendant] had access, in proximity to drug-packaging materials"); see also Montenegro, 221 F. App'x at 529 (upholding application of § 2D1.1(b)(1) enhancement when unloaded firearms were found in the defendant's residence a month after the last completed drug transaction for which he was indicted occurred).

Further, the record does not evince that it was "clearly improbable" that the stolen handgun was connected with Defendant's drug offenses. Therefore, Defendant's objection to the two-level enhancement under section 2D1.1(b)(1) is overruled.

**D.  Obstruction of Justice Enhancement**

Defendant objects to Probation's recommendation in paragraph twenty-one of the PSR that he receive a two-level enhancement under Sentencing Guideline § 3C1.1 for "willfully obstruct[ing] or imped[ing] . . . the administration of justice." (Def.'s Objs. 2:25-28.) The basis for Probation's recommendation that the obstruction of justice enhancement be applied is as follows:

> The defendant, while fleeing from numerous police officers, discarded cocaine base from the vehicle he was driving. Additionally, he staged a burglary at his apartment where he resided so that the drugs stored therein could be removed before the apartment was searched. Given his conduct, a 2-level increase is recommended pursuant to Application Note, 3C1.1(4)(D).

(PSR ¶ 21.) Defendant argues:

> Fleeing from arrest is not obstruction[,] and the police had no right to search his residence at the time - so if he called to have anything removed from the house he was preventing an illegal search of his residence. There is no evidence as to whether the items taken from the home were a related offense.

(Def.'s Objs. 2:25-28.) Concerning the burglary, Defendant further argues:

> [T]here was evidence that [Defendant's] apartment suffered a burglary, but no evidence that he "aided or abetted, counseled, commanded, induced, procured, or willfully caused" the crime. USSG § 3C1.1, app. N. 9. Nor was there any evidence that any items taken from the home were related to the "investigation, prosecution, or sentencing of the instant offense of conviction." USSG § 3C1.1.

(Def.'s Suppl. Briefing 8:25-9:3.)

The government counters that "the PSR correctly recommended that the Court impose a two-level enhancement . . . for obstruction of justice" since "the Court previously found that [Defendant] directed his criminal associates to burglarize his apartment to remove drug evidence in anticipation that police would search his apartment as a result of his conduct in dumping drugs during the February 1, 2011, police pursuit." (Gov't Resp. 12:23-13:10.)

Section 3C1.1 prescribes:

> If (1) the defendant willfully obstructed or impeded . . . the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conducted related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by [two] levels.

Application Note four to this sentencing guideline provides a non-exhaustive list of examples of conduct to which this enhancement applies, including:

> (D) destroying or concealing or *directing or procuring another person to destroy or conceal evidence that is material to an official investigation* or judicial proceeding (e.g., shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence), or attempting to do so; however, if such conduct occurred contemporaneously with arrest (e.g., attempting to swallow or throw away a controlled substance), it shall not, standing alone, be sufficient to warrant an adjustment for obstruction unless it results in a material hindrance to the official investigation or prosecution of the instant offense or the sentencing of the offender.

(emphasis added).

Here, the record evinces, by a preponderance of the evidence, that Defendant "staged a burglary at the apartment where he resided so

that drugs stored therein could be removed before the apartment was searched." (Hr'g Tr. 22:5-7, June 29, 2012, ECF No. 79.) During the police pursuit on February 1, 2011, "an officer observed [Defendant] talking on the phone." (PSR ¶ 4.) Shortly thereafter, "an apartment manager reported a burglary at [Defendant's] apartment." (Id. ¶ 5.) "[D]uring the safety walkthrough [in response to the burglary report], officers observed a white powdery substance in plain view on the kitchen counter. Officers also saw several clear plastic baggies containing white powdery residue." (Id.) The walk through also revealed drug paraphernalia used to produce crack cocaine. (Trial Tr. 221:22-225:21.)

City of Fairfield Police Officer Franco Cesar investigated the reported burglary at Defendant's residence. (Trial Tr. 218:16-25.) Officer Cesar testified that his investigation revealed evidence inconsistent with a residential burglary. (Id. at 228:7-13.) For example, valuables were left in the living room, including a big screen television with surround sound speakers "right next to the door." (Id. 220:18-221:21.) Further, Officer Cesear testified that the condition in which the apartment was left suggested "whoever came in knew what they were looking for." (Id. 225:22-226:3, 228:25-229:10.) Officer Cesar provided the following additional testimony:

> Q. Do you attach any significance to the fact that [Defendant] made [a] telephone call [during the police pursuit] and shortly thereafter there was a break-in at his apartment?
>
> A. Yes.
>
> Q. What is the significance?
>
> A. Whoever [Defendant] was calling, from my experience and training, [Defendant] was giving directions for that individual to go into his apartment to take whatever evidence might be left in there.

10

(Id. at 229:19-230:11.)

The referenced circumstantial evidence and opinion testimony of Officer Cesar evinces that Defendant "procured another person[(s)]" to destroy or conceal evidence that was material to the investigation of his drug offenses.

Further, Defendant's obstructing conduct did not occur "contemporaneously with arrest." See United States v. Unger, 484 F. App'x 78, 83 (8th Cir. 2012) (upholding application of section 3C1.1 enhancement where the defendant's "destruction and attempted concealment of evidence occurred prior to his . . . arrest"); see also United States v. Bedford, 446 F.3d 1320, 1325 (10th Cir. 2006) (indicating the "contemporaneously with arrest" exception is meant to include "spontaneous[] or reflexive[]" conduct, not actions taken "consciously . . . with the purpose of obstructing justice").

For the stated reasons, Defendant's objection to the two-level enhancement under section 3C1.1 is overruled.

**E.   Reckless Endangerment Enhancement**

Defendant objects to paragraph twenty-two of the PSR, which recommends a two-level enhancement under Sentencing Guidelines § 3C1.2(b)(1) for reckless endangerment during flight. (Def.'s Objs. 3:1-12.) Defendant argues that his conduct during the police pursuit was negligent, not reckless. (Id. at 3:1-2.) Defendant also argues: "there was no conduct demonstrating knowing disregard for human life or that [Defendant] created a substantial risk of death." (Id. 3:2-4.)

The government rejoins, arguing Defendant's conduct "was reckless and threatened the lives and safety of the public on the roads and the officers pursuing him." (Gov't Resp. 13:26-28.)

Section 3C1.2 prescribes: "[i]f the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer, increase [the offense level] by [two] levels." For purposes of this guideline, "reckless" means "a situation in which the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation." U.S. Sentencing Guidelines § 2A1.4, cmt. n.1 (2010).

Here, the record evinces, by a preponderance of the evidence, that Defendant recklessly created a substantial risk of death or serious bodily injury to another person(s) during the February 1, 2011 police pursuit. Paragraph four of the PSR states:

> Police attempted to conduct a traffic stop on [Defendant]'s vehicle . . . . [Defendant] drove into the parking lot at Bonfare Market; however, he failed to come to a complete stop. As another officer entered the parking lot to assist, [Defendant] accelerated through the parking lot, almost striking an officer's vehicle. Subsequently, a vehicle pursuit ensured [sic]. [Defendant] ran a red light on Sunset Avenue. Then he made an abrupt right turn onto Highway 12 and ran another red light as he traveled westbound. He traveled up to 85 miles per hour at times. . . . Subsequently, the officers terminated the pursuit near Red Top Road exit in Cordelia, California.

Officer Brunie testified at trial that he "observed [Defendant] accelerate his vehicle out of the [Bonfare Market] parking lot, almost colliding with Officer Carter." (Trial Tr. 20:3-11.) Officer Brunie further testified that Defendant ran multiple red lights, drove at high speeds up to 90 miles per hour, and drove "onto the median, and then for a short distance was going westbound in the eastbound lanes to

get around the stopped cars at the red light." (Id. at 20:12-18, 21:15-19, 29:2-9, 97:8-12, 124:7-15.)

The referenced evidence supports application of the reckless endangerment enhancement. See United States v. Luna, 21 F.3d 874, 885 (9th Cir. 1994) (upholding application of section 3C1.2 enhancement where there was deputy testimony that defendant, *inter alia,* "ran three stop signs" and "stopped in the middle of the road"); United States v. Holley, 228 F. App'x 741, 742 (9th Cir. 2007) (upholding application of section 3C1.2 enhancement where "[t]he record show[ed] that [defendant] . . . attempted to flee by driving erratically, at high speed, and on the wrong side of the road").

For the stated reasons, Defendant's objection to the two-level enhancement under section 3C1.2 is overruled.[3]

Dated: July 8, 2013

GARLAND E. BURRELL, JR.
Senior United States District Judge

---

[3] Defendant further argues "the reckless endangerment adjustment cannot be applied if the obstruction of justice [enhancement] is also based on [Defendant's] flight." (Def.'s Objs. 10:1-2.) Decision on this argument is unnecessary since Defendant's flight is not a basis for the Court's application of the obstruction of justice enhancement under section 3C1.1.